IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| JAMES A. HAIGH, | **No. 06-CV-4081-DEO** |
| Plaintiff, | |
| vs. | **ORDER ON DEFENDANT'S MOTION** |
| GELITA USA, INC., | **FOR SUMMARY JUDGMENT** |
| Defendant. | |

_____

## I. INTRODUCTION

This matter is before the Court on Defendant Gelita USA's motion for summary judgment pursuant to Fed. R. Civ. P. 56. Doc. No. 85. In support of its motion, Defendant argues that there are no genuine issues of material fact with respect to Plaintiff's claims for disability discrimination, age discrimination, and retaliation.[1] Thus, Defendant argues it is entitled to summary judgment as a matter of law.

## II. FACTUAL BACKGROUND

The record in this case, when viewed in the light most favorable to the non-moving party, Plaintiff, reveals the following facts:

---

[1] The Court previously dismissed Counts IV, V, and VI in this matter. See Doc. No. 40. Thus, only Counts I, II, and III of Plaintiff's complaint remain.

**A. Employment Basics**

Plaintiff was born in 1937 and was 60 years old when Defendant hired him. Plaintiff began his employment with Defendant on May 4, 1998, and worked as a project/process engineer in Defendant's engineering department.

Plaintiff's first supervisor at Gelita was Larry Russell,[2] to whom he reported until 2002. In his position as a project/process engineer, Plaintiff did not operate any equipment and was not involved in the production of products. On December 20, 2001, Plaintiff filed a complaint with Defendant's Director of Human Resources, Mark Tolsma, complaining of being harassed. Plaintiff did not inform Tolsma of the identity of the person harassing him. Tolsma informed Plaintiff that there was not much he could do without knowing the details of the harassment.[3]

In 2002, Plaintiff obtained a new title as environmental

_____

[2]  Russell reported to Carl Sitzmann.

[3]  Plaintiff testified at his deposition that Carl Sitzmann was the person who reportedly initiated and encouraged the harassment. Pl. App. 34, Haigh Dep. 125:17-24. This appears to be the basis for Plaintiff's retaliation claim in this case. However, as the Court will explain below, Plaintiff's counsel could not find any support in the record for a retaliation claim.

engineer to Defendant and began reporting to Richard Schaefer. As an environmental engineer, Plaintiff was at least partially responsible for keeping Defendant in compliance with OSHA-related and EPA-related regulations. There is an issue of fact as to the level of responsibility that Plaintiff had for the environmental testing laboratory, the operation of the wastewater treatment facility, and conducting environmental safety training.

In his position as environmental engineer, Plaintiff supervised Kelly Markham, who conducted certain laboratory duties and sampled and tested the wastewater lagoons. Plaintiff would, on occasion, accompany Markham to the lagoons.

In July 2003, both Plaintiff and Markham began reporting to Mark Skibinski, who was Gelita's Environmental Health & Safety Manager. Plaintiff's employment subsequently ended on or about October 31, 2003.

**B. Plaintiff's Job Performance and Evaluations**

Plaintiff underwent annual performance evaluations while employed with Defendant. The evaluations utilized a ten-point

rating system,[4] applied to fourteen different categories.[5] Russell completed Plaintiff's evaluations from 1998 through 2001. Schaefer completed the performance evaluation for 2002. Plaintiff received an overall rating of 4.8 for 1998, 5.4 for 1999, 5.0 for 2000, 5.2 for 2001, and 5.3 for 2002, which represented "good" ratings. However, Plaintiff's lowest ratings were in the categories of "judgment," "interpersonal skills," and "communication skills."

On November 11, 1999, Russell met with Plaintiff and informed him that too many interpersonal and communication problems continued to arise with him. Russell also met with Plaintiff on September 26, 2000, to discuss continuing problems with Plaintiff's interpersonal relationships and written communications. Plaintiff denies there were any such interpersonal relationship or written communication issues, or if there were, such issues were resolved to Russell's

---

[4]    Excellent (8 - 10 points); Very Good (6 - 8 points); Good (4 - 6 points); Improvement needed (2 - 4 points); and Unsatisfactory (0 - 2 points).  Pl. App. 49.

[5]    Job Knowledge; Quality Emphasis; Productivity; Safety; Supervision Skills; Cost/Budget Control; Judgment; Innovation/Initiative; Interpersonal Skills; Adherence to Policies/Procedures; Planning and Organization; Communication Skills; Attendance; and Dependability.  Pl. App. 49-54.

satisfaction.

In Plaintiff's position as environmental engineer,
Plaintiff received monthly letters from Aaron Kraft, the
Assistant Environmental Services Director for the Sioux City
Department of Environmental Services. Pl. App. 97; Pl. App.
21, Deposition of James A. Haigh 75:12-22. On July 23, 2003,
Plaintiff's supervisor (as of July 2003), Skibinski, wrote
Plaintiff an e-mail inquiring whether Plaintiff responded to
a November 2002 letter from Sioux City requesting information
regarding dredging of lagoons. Pl. App. 94. Skibinski also
requested a copy of the city's letter and a copy of
Plaintiff's response to the letter. Plaintiff responded to
this e-mail and informed Skibinski that he did not have a copy
of the letter, that "clearly there was no letter of [November]
2002." Pl. App. 95. Plaintiff also stated that he could not
give Skibinski "a copy of a response to a non-existing
letter." Pl. App. 95. The summary judgment record shows,
however, that Aaron Kraft sent a letter to Plaintiff, dated
November 4, 2002, regarding, in part, the dredging of the
lagoons. Pl. App. 97. At his deposition, Plaintiff testified
that he did not specifically recall receiving this letter and

that he did not know if the letter had anything to do with his response to Skibinski's July 23, 2003, e-mail. Pl. App. 24, Haigh Dep. 85:15-87:15.

Plaintiff was aware that his new supervisor, Skibinski, was unhappy with his performance. On September 30, 2003, Skibinski met with Plaintiff and presented him with a memorandum dated September 29, 2003, which detailed several areas of deficiency in Plaintiff's work performance. The memorandum stated that Plaintiff was underperforming in the following areas: (1) failure to meet assigned deadlines; (2) failure to improve communications with Skibinski and other key contacts within and outside of the organization; (3) inappropriate delegation of key environmental responsibilities; (4) providing vague and/or misleading information in issues/concerns; and (5) mismanagement of the wastewater treatment facility. Def. App. 44-45, Pl. App. 92-93. The memorandum stated that Plaintiff's performance was unacceptable and improvement was needed. The memorandum also outlined Skibinski's expectations for Plaintiff. Specifically, Skibinski communicated to Plaintiff the following expectations: (1) all assigned deadlines will be

met; (2) development and implementation of a communication plan to strengthen the working relationship with Skibinski and other key individuals; (3) proper management, administration, oversight and follow-through on all key environmental responsibilities; (4) provide brief, succinct, timely, and accurate feedback on a regular basis on all significant environmental activities; and (5) proper management of the wastewater treatment facility. Skibinski informed Plaintiff in the memorandum that further disciplinary action would be taken if his performance did not significantly improve within ninety (90) days. Pl. App. 93.

On October 25, 2003, Plaintiff wrote a letter to the Director of Human Resources, Tolsma, and addressed the complaints of his Supervisor, Skibinski, regarding Plaintiff's performance. Pl. App. 104. In response to Skibinski's complaint about Plaintiff mismanaging the wastewater treatment facility, Plaintiff explained his actions as standard operating practice, and stated, "if [Skibinski] was qualified by education, experience or professional license, he would have known this." Pl. App. 104. Plaintiff continued:

> As for your question Friday as to my being
> able to meet Mark[']s "expectations." I

said I could not.  I have no idea what his
expectations are in spite of asking him to
put them in writing.  How can I say I would
meet what I don't know?  As a point of
fact, when he accused me of mismanaging the
[wastewater treatment facility] by slowing
to the pumps to try to keep us in
compliance, I asked him to tell me, in
writing, how he wanted me to run the
[wastewater treatment facility].  He
refused saying I was responsible.  I cannot
be responsible without the authority to do
so.  That is a very basic management
principal.  If you want someone to fail,
you give them responsibility and no
authority to get the job done.

If you had asked me last Friday[,] "can and
would you do the job in a professional
manner,["] I would gladly have said "yes"
so long as I had a professional manager who
was more interested in being a manager and
getting the job done than playing games to
make me look bad[,] or one who was more
concerned about the city than the company.
As for your questions about my having
requested more help earlier and now saying
you do not need me, it is perfectly
understandable.  At the time asked for
help, I had lost a full time assistant and
had a technician ½ time who [sic] and a 9
year old air permit to control blowing up
in our faces...

Pl. App. 104-105.  Plaintiff ended the letter requesting an

opportunity to formally respond to Skibinski's complaints and

his written list of deficiencies.

On October 24 and/or 29, 2003, Skibinski and Gelita's Director of Human Resources, Mark Tolsma, met with Plaintiff to discuss Plaintiff's performance and the expectations set forth for him. Plaintiff informed Tolsma he could not meet the expectations set out for him. Plaintiff felt that the expectations were impossible demands. Plaintiff also informed Tolsma that he could no longer work for Skibinski. Plaintiff's employment terminated on October 31, 2003, at the age of 66.

C. **Plaintiff's Medical Condition**

The summary judgment record reveals a number of Plaintiff's medical conditions and procedures. In 1999, Plaintiff pinched a nerve in his neck, which caused him pain, had to be treated with pain killers, and was aggravated by stress. In February 2001, Plaintiff had surgery for bone spur[6] removal and plantar fasciitis.[7] Plaintiff was issued a

---

[6] Bone spurs are "bony projections that develop along the edges of bones. The bone spurs themselves aren't painful, but they can rub against nearby nerves and bones and cause pain." http://www.mayoclinic.com/health/bone-spurs/DS00627.

[7] "Plantar fasciitis is irritation and swelling of the thick tissue on the bottom of the foot." Medline Plus Medical Encyclopedia,

(continued...)

permanent, nonexpiring handicapped parking permit several months following the February 2001 surgery. Pl. App. 103, 109. Dr. John Cook, who recommended the permit, stated that Plaintiff had permanent "chronic pain from fibromyalgia[8] and lumbar facet syndrome,"[9] and had "great difficulty in ambulating more than one hundred feet." Pl. App. 109. In January 2003, Plaintiff's physician, Dr. Cook, wrote a letter to an attorney regarding Plaintiff's condition.[10] Pl. App. 118. The letter stated that Plaintiff had a long history of chronic neck pain and that most of his problems have occurred

---

[7] (...continued)
http://www.nlm.nih.gov/medlineplus/ency/article/007021.htm.

[8] "Fibromyalgia is a common condition characterized by long-term, body-wide pain and tender points in joints, muscles, tendons, and other soft tissues." Medline Plus Medical Encyclopedia,
http://www.nlm.nih.gov/medlineplus/ency/article/000427.htm.

[9] Lumbar is "relating to the loins, or the part of the back and sides between the ribs and the pelvis." Stedman's Medical Dictionary (28th ed. 2006) ("Stedman's") at 1121. Facet is "[a] small smooth area on a bone or other firm structure, usually an articular surface covered in life with articular cartilage." Stedman's at 690.

[10] Defense counsel stated at the summary judgment hearing that he did not know the attorney who received the letter. There is no indication anyone at Gelita read or received this letter.

from traumatic arthritis that he received in multiple car accidents in 1974 and 1984. The letter also stated that Plaintiff had problems with his lumbar spine related to chronic mechanical low back pain and with facet arthritis and degenerative disc disease at the lumbosacral level. Dr. Cook further stated that he has treated Plaintiff with a number of medications for pain relief and situational depression and anxiety, and that Plaintiff would probably need to be on his medications the rest of his life to benefit from any quality of life. Without the medication, Dr. Cook stated that he doubted Plaintiff would be able to function during the daytime and/or be able to do any kind of meaningful activity such as gainful employment.

While employed at Gelita, Plaintiff attended a pain clinic at various times. Carl Sitzmann and Plaintiff's supervisor, Larry Russell, were aware of this. At his deposition, Plaintiff stated that the company was "very nice to [Plaintiff]" and that they permitted him to take time off from work every month to attend the pain clinic. Pl. App. 45, Haigh Dep. 169:8-11. Moreover, while employed at Gelita, Plaintiff requested and received an orthopedic chair and a

modification to his work station.  Pl. App. 38, Haigh Dep. 141:8-143:5.

Prior to Skibinski becoming Plaintiff's supervisor, Plaintiff complained to Skibinski regarding certain remarks about Plaintiff's use of his handicapped parking permit.  When Schaefer became Plaintiff's supervisor, Plaintiff sent Schaefer an internal communication letter, which advised him of the permit.  Plaintiff stated:

> Due to the fact that bone injuries, such as those sustained by me, can take 3 to 6 years (or more) to heal or be free of pain, a PERMANENT NONEXPIRING Permit was granted. While it may appear that I have no problem, appearances are deceiving.  If some people feel that I am misusing someone else's permit, you now have the means and knowledge to correct their misconception.

Pl. App. 101.  In this communication, Plaintiff also wrote a "nonmedical comment" in which Plaintiff informed Schaefer that he used the parking spot for both job related and personal reasons.  In this comment, he noted that the parking spot was closer than having to walk to the company truck, since he tried to limit his amount of walking.  He stated, "[s]ome days, I have [no] problems but on others I have considerable pain to deal with."  Pl. App. 101.

While Plaintiff was employed at Gelita, he occasionally played golf and basketball.

## III.   LAW AND ANALYSIS

Plaintiff filed this action alleging violations of the Americans with Disabilities Act ("ADA"), Age Discrimination in Employment Act ("ADEA"), and retaliation under 42 U.S.C. § 2000e-3. Defendant subsequently brought this motion for summary judgment pursuant to Fed. R. Civ. P. 56.

### A.  Standards for Summary Judgment

The standard for granting summary judgment is well established. A motion for summary judgment may be granted only if, after examining all of the evidence in the light most favorable to the nonmoving party, the Court finds that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Montgomery v. John Deere & Co., 169 F.3d 556, 559 (8th Cir. 1999). A fact is material if it might affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255

(1986).  An issue of material fact is genuine "if it has a real basis in the record."  <u>Hartnagel v. Norman</u>, 953 F.2d 394, 395 (8th Cir. 1992) (citing <u>Matsushita</u>, 475 U.S. at 586-87).

The party moving for summary judgment bears the "initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of genuine issue."  <u>Celotex</u>, 477 U.S. at 323. Once the moving party has carried its burden, the opponent must go beyond the pleadings and designate specific facts-by such methods as affidavits, depositions, answers to interrogatories, and admissions on file-that show there is a genuine issue for trial.  <u>See</u> Fed. R. Civ. P. 56(e); <u>Celotex</u>, 477 U.S. at 324.  The evidence of the nonmoving party is to be considered as true, and justifiable inferences arising from the evidence are to be drawn in his or her favor.  <u>Anderson</u>, 477 U.S. at 255.  If the evidence of the nonmoving party is "merely colorable," or is "not significantly probative," summary judgment may be granted.  <u>Id.</u> at 249-50.  Thus, although the nonmoving party does not have to provide direct proof that genuine issues of fact exist for trial, the facts and circumstances that the nonmoving party relies upon must

"attain the dignity of substantial evidence and must not be such as merely to create a suspicion." Metge v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985). In essence, the evidence must be "such that a reasonable jury could find a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

As employment actions are inherently fact based, the Eighth Circuit has repeatedly cautioned that summary judgment should "seldom be granted ... unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." Hindman v. Transkrit Corp., 145 F.3d 986, 990 (8th Cir. 1998) (citations omitted). See also Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citing Johnson v. Minnesota Historical Soc'y, 931 F.2d 1239, 1244 (8th Cir. 1991)) ("summary judgment should seldom be used in employment-discrimination cases"); Hillebrand v. M-Tron Indus., Inc., 827 F.2d 363, 364 (8th Cir. 1987). This is because "inferences are often the basis of the claim ... and 'summary judgment should not be granted unless the evidence could not support any reasonable inference' of discrimination." Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1156 (8th Cir. 1999) (quoting Lynn v. Deaconess

Med. Ctr.-West Campus, 160 F.3d 484, 486–87 (8th Cir.1998)).

Nevertheless, the plain language of Fed. R. Civ. P. 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See Celotex, 477 U.S. at 322; see also Snow v. Ridgeview Med. Ctr., 128 F.3d 1201, 1205 (8th Cir. 1997) (citing Bialas v. Greyhound Lines, Inc., 59 F.3d 759, 762 (8th Cir. 1995)).

**B. Disability Discrimination Under the ADA**

Plaintiff argues that the areas of deficiency stated in Skibinski's September 29, 2003, memorandum to Plaintiff were created to provide a pretext for firing Plaintiff. Specifically, Plaintiff alleges that he requested and received his assistant, Kelly Markham, as an accommodation for his alleged inability to walk around and inspect the plant and lagoons. Plaintiff alleges that once he began reporting to Skibinski, Markham was reassigned from Plaintiff's supervision and no longer did anything for Plaintiff. Plaintiff alleges that once Gelita reassigned Markham, "it effectively removed

16

the only accommodation that allowed [Plaintiff] to perform the essential job functions of inspecting areas around the plant." Pl. Resist. Br. 10.  Thus, Plaintiff argues that his "ability to perform one of the essential functions of his job – conduction [of] visual inspections in and around the plant – was significantly impacted."  Pl. Resist. Br. 11.  Plaintiff alleges that when he requested that Skibinski replace Markham, Skibinski refused.  Thus, Plaintiff alleges that Skibinski made it impossible for Plaintiff to perform his job, which created an environment in which Plaintiff could not succeed and would ultimately be fired.

In response, Defendant argues that although Plaintiff was no longer Markham's supervisor starting in July 2003, Markham's job responsibilities of conducting inspections and tests never changed.  In support of its argument, Defendant cites to deposition testimony of Markham and Skibinski in which they testified that Markham continued to perform the functions of testing and inspections throughout the summer and fall of 2003.  Defendant argues that Plaintiff was not fired, but that his employment ended on October 31, 2003, when Plaintiff stated he could not meet the expectations set for

17

him by Skibinski, nor could he work for Skibinski.

Under the ADA, it is unlawful for an employer to "discriminate against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a).[11] Discrimination claims under the ADA are analyzed under the burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under the McDonnell Douglas framework, a plaintiff must first establish a prima facie case of discrimination. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Once the employer meets this burden of production, the plaintiff must show that the legitimate reason proffered by the employer is a pretext for discrimination. See Young v. Warner-Jenkinson Co., Inc., 152 F.3d 1018, 1021 (8th Cir.

_____

[11] Congress amended the ADA when it enacted the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553. Neither party, however, has argued for retroactive application, and the Court is persuaded retroactive application is not warranted. See Landgraf v. USI Film Prods., 511 U.S. 244, 280 (1994) (no retroactive application of legislation if it "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed"). Thus, references in this Order to ADA statutes will be as they existed prior to the ADA Amendments Act.

1998).  The burden of persuasion remains at all times with Plaintiff.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).

To establish a prima facie case under the ADA, Plaintiff must show that (1) the employee is disabled within the meaning of the ADA; (2) the employee is qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) the employee suffered an adverse employment action because of the disability.  Simpson v. Des Moines Water Works, 425 F.3d 538, 542 (8th Cir. 2005).

In the first step of a plaintiff's prima facie case, a plaintiff must demonstrate that he is "disabled" as defined under the ADA.  A plaintiff is disabled under the ADA if he (A) has a physical or mental impairment that substantially limits one or more of his major life activities, (B) has a record of such an impairment, or (C) is regarded as having such an impairment.  42 U.S.C. § 12102(2).  "[T]o be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives."  Wood v.

Crown Redi-Mix, Inc., 339 F.3d 682, 685 (8th Cir. 2003)
(quoting Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S.
184 (2002)).  In determining whether an impairment severely
restricts an individual from performing a major life activity,
courts will consider "(1) the nature and severity of [the
individual's] impairment, (2) its duration or anticipated
duration, and (3) its long-term impact." Wood, 339 F.3d at
685.

In this case, the ultimate question is whether
Plaintiff's neck, back, and foot problems substantially
limited him from performing the major life activities of
standing, sitting for long periods, and walking.[12]  Based on
the evidence in the record, the Court is persuaded that
Plaintiff has submitted sufficient evidence to create a
genuine issue of material fact as to whether Plaintiff's neck,
back, and foot problems constituted a "disability" under the
ADA.  Plaintiff submitted extensive medical records regarding
his alleged impairments in resistance to Defendant's motion

_____

[12]  The Eighth Circuit has previously found standing,
sitting, and walking to constitute major life activities.  See
Webner v. Titan Distribution, Inc., 267 F.3d 828, 834 (8th
Cir. 2001).

for summary judgment. Pl. App. 108-128. Moreover, Dr. Cook recommended Plaintiff for a handicapped parking permit, where he stated Plaintiff had "chronic pain from fibromyalgia and lumbar facet syndrome," and had "great difficulty in ambulating more than one hundred feet." Pl. App. 109. Dr. Cook further stated that the condition was permanent. Pl. App. 109. While Plaintiff's possession and use of a handicapped permit alone may not be sufficient to find him disabled under the ADA, it is certainly relevant in considering the nature and severity of his impairments.[13]

The Court recognizes Plaintiff has stated that, at times, he did not have difficulties walking. And, as the Eighth Circuit noted in Wood, the standard to determine whether an impairment substantially limits a major life activity is high. The Court is persuaded, however, that there is sufficient medical evidence in the record to create a genuine issue of material fact as to this issue.

_____

[13] See Wood, 339 F.3d at 686 (plaintiff not substantially limited in the major life activity of walking when he could walk approximately one-quarter of one mile before he must stop and rest, when parts of his toes and his left leg were numb and his left knee collapsed, when he walked with a cane on occasion, and when he had not obtained a handicapped parking pass).

At the second step of a plaintiff's prima facie case, a plaintiff must establish that he was qualified to perform the essential functions of the job with or without reasonable accommodation. "A qualified individual must possess the requisite skill, experience, education and other job-related requirements for the position and must be able to perform the essential functions of the position with or without reasonable accommodation." Webner v. Titan Distribution, Inc., 267 F.3d 828, 835 (8th Cir. 2001).

As to the first prong of this inquiry, whether Plaintiff possessed the "requisite skill, experience, education and other job-related requirements for the position," Plaintiff received his bachelor of science degree from the University of Rhode Island and obtained his professional engineers license in 1973. Pl. App. 5-6, Haigh Dep. 11:14-12:23. In addition, "[Plaintiff] can establish the first part of the inquiry by virtue of having previously held the position." Hatchett v. Philander Smith College, 251 F.3d 670, 674 (8th Cir. 2001). Defendant hired Plaintiff in 1998, where he worked until his termination in 2003. Moreover, Plaintiff received consistent overall annual performance review ratings of "good" while

employed at Gelita.  Thus, the Court is persuaded that
Plaintiff has presented sufficient evidence to generate a
genuine issue of material fact as to whether he possessed the
requisite skill, experience, education and other job-related
requirements for the position.

The next question is whether Plaintiff could perform the
essential functions of the position with or without reasonable
accommodation.  The Court is persuaded that an issue of
material fact exists as to whether inspecting the areas around
the plant was an essential function of Plaintiff's job.  The
Court is aware Plaintiff argues that the reassignment of
Markham as Plaintiff's assistant "effectively removed the only
accommodation that allowed [Plaintiff] to perform the
essential job functions of inspecting areas around the plant."
Pl. Resist. Br. 10.  However, the Court cannot ignore certain
statements in Plaintiff's deposition that may contradict the
allegation that those duties were essential functions of his
role as environmental engineer.  Plaintiff stated:

> My department and my duties ... My main
> duty was compliance, not operating.  And my
> department consisted of two functions.  One
> was the operating function with the
> wastewater treatment plant and do other
> things, collect samples, inspections and

other things.  And all of the physical
activities were under the operational end.
I was the compliance or decision making
end.  And when I ceased to have somebody to
do the operating portion of my department's
requirements, I was unable to fulfill my
duties ... So removing the operational
portion and not replacing it made it
impossible for me to do my job, and that
was because of my physical ability.

Pl. App. 41-42, Haigh Dep. 155:17-156:14.  Regarding
inspections of the lagoon, Plaintiff stated:  "No, none of
that was my job.  Inspecting it wasn't my job.  That's
[Markham's] job.  That's the operating part of it."  Pl. App.
42, Haigh Dep. 157:21-23.

Moreover, there is an issue of fact as to whether Markham
continued her testing and inspection duties after she began
reporting to Skibinski in July 2003 and, if she did, whether
Plaintiff utilized the results of these tests and inspections
as he did when he supervised her.  Plaintiff argues that
Markham no longer reported to him or did any testing or
inspections for him.  Defendant argues that she continued to
perform the same duties she always performed including
sampling the lagoons, and that those duties were never
assigned to Plaintiff.  Def. Reply Br. 3.

At this point, the record is not sufficiently developed to determine the essential functions of Plaintiff's position, whether his request for an accommodation was unreasonable, or whether any reasonable accommodation existed. Thus, the record is not clear on whether Plaintiff's request that Markham be replaced was a reasonable accommodation. The Court is mindful, of course, of the longstanding principle that "[w]hile job restructuring is a possible accommodation under the ADA ... an employer need not reallocate or eliminate the essential functions of a job to accommodate a disabled employee." Fjellestad, 188 F.3d at 950 (citing Benson v. Nw. Airlines, Inc., 62 F.3d 1108, 1112 (8th Cir. 1995)). Thus, if inspection and operating duties were an essential function of Plaintiff's job, the Court is not persuaded that Plaintiff would necessarily be entitled to an assistant as a reasonable accommodation, though the Court is not so holding at this time. The Court is persuaded Plaintiff has presented a genuine issue of material fact as to whether he could perform the essential functions of his job with or without reasonable accommodation.

The final step of a plaintiff's prima facie case is whether the plaintiff suffered an adverse employment action because of the disability.  To prove this element, Plaintiff must show that he suffered an adverse employment action "under circumstances from which an inference of unlawful discrimination arises."  Young v. Warner-Jenkinson Co., Inc., 152 F.3d 1018, 1021-22 (8th Cir. 1998).  An inference of unlawful discrimination "may be raised by evidence that a plaintiff was replaced by or treated less favorably than similarly situated employees who are not in the plaintiff's protected class."  Id. at 1022.  However, evidence of disparate treatment is not "the exclusive means by which a plaintiff may establish an inference of discrimination."  Id. "Proof necessary to establish a prima facie case in discrimination cases is not inflexible and varies somewhat with the specific facts of each case."  Id. (internal quotations omitted).  Furthermore, "the threshold of proof necessary to establish a prima facie case is minimal."  Id.

In this case, there is no evidence in the summary judgment record that Defendant replaced Plaintiff or treated similarly situated employees outside of Plaintiff's alleged

class differently. The record is not clear whether Gelita officials expressed or acted with animosity toward Plaintiff because of his alleged disability, aside from the alleged complaints and comments made by employees regarding Plaintiff's use of the handicapped parking stall.

As mentioned, however, there is an issue of fact as to whether Plaintiff requested a reasonable accommodation for his alleged disability and whether Defendant denied such an accommodation. Denying a reasonable accommodation may be relevant to show Defendant's discriminatory attitude toward Plaintiff. See Kells v. Sinclair Buick-GMC Truck, Inc., 210 F.3d 827, 834 (8th Cir. 2000).[14] Plaintiff testified at his deposition that Defendant provided him a new chair and

---

[14] The Court recognizes that Plaintiff has not argued a reasonable accommodation claim under the ADA, but that he is instead alleging Defendant terminated him because of his actual disability. However, when a claim such as Plaintiff's is largely dependent on inferences, evidence that may infer a discriminatory attitude among Defendant's employees and decision makers is relevant to the question of whether Plaintiff was terminated under circumstances from which an inference of unlawful discrimination arises. Employers have a responsibility to engage in an interactive process when employees request accommodations due to an alleged disability. "The failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is prima facie evidence that the employer may be acting in bad faith." Fjellestad, 188 F.3d at 952.

modification to his work station upon his request. Plaintiff also testified that Defendant was very nice to him in permitting him to take off work for his medical appointments. However, the record shows that Plaintiff received the chair and modification to his workstation prior to Skibinski becoming his supervisor. The record presents an issue of material fact as to whether Plaintiff was denied a reasonable accommodation once Skibinski became his supervisor and whether Skibinski had a discriminatory attitude towards Plaintiff's alleged disability. Thus, the Court is persuaded that Plaintiff has raised a genuine issue of material fact as to whether Plaintiff was terminated under circumstances from which an inference of unlawful discrimination arises. Plaintiff has set forth sufficient evidence to create a genuine issue of material fact as to his prima facie case under the ADA.

Once the plaintiff has established his prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. In this case, Defendant claims that Plaintiff was terminated because he refused to work for Skibinski and because he said

he could not meet Skibinski's expectations.  Defendant cites to Plaintiff's history of lower performance reviews as well as Plaintiff's interpersonal and communication issues.  Plaintiff was aware that Skibinski was not happy with his performance, as demonstrated by Skibinski's September 29, 2003, memorandum outlining Plaintiff's deficiencies and expectations.  Subsequently, when Plaintiff informed Tolsma that he could not work for Skibinski and that he felt Skibinski's expectations were impossible, he was terminated.

The Court is persuaded Defendant has produced sufficient evidence to show that its reasons for terminating Plaintiff were legitimate and nondiscriminatory.  Terminating an employee who refuses to work for his supervisor and claims that his supervisor's job expectations are impossible to meet is legitimate.

When the employer produces a legitimate, nondiscriminatory reason for its adverse employment action, the burden returns to the plaintiff to prove that the employer's proffered reason is a pretext for discrimination. Thus, a plaintiff must produce evidence that the employer's reason is false and that there is a reasonable inference of

unlawful discrimination. <u>Young</u>, 152 F.3d at 1023. "[A]n inference of discrimination may sometimes arise without additional evidence where the overall strength of the prima facie case and the evidence of pretext suffice[s] to show intentional discrimination." <u>Id.</u>[15]

In this case, Plaintiff has produced evidence that he believed it was impossible to meet Skibinski's expectations. Plaintiff argued such expectations would violate company policy and that Skibinski would not inform him how Skibinski wanted the wastewater treatment facility run. In reference to Skibinski's claim that Plaintiff mismanaged the wastewater treatment facility, Plaintiff's October 25, 2003, letter to Tolsma stated: "I cannot be responsible without the authority to do so ... If you want someone to fail, you give them responsibility and no authority to get the job done." Pl. App. 105. The Eighth Circuit has held that "it is permissible

---

[15] <u>See also</u> <u>Reeves</u>, 530 U.S. at 148 (plaintiff's prima facie case, combined with sufficient evidence to find that employer's asserted reason for adverse employment action is false, <u>may</u> permit trier of fact to conclude that employer unlawfully discriminated); <u>see also</u> <u>Wallace v. DTG Operations, Inc.</u>, 442 F.3d 1112, 1120 n.2 (8th Cir. 2006) ("As the Court made clear in <u>Reeves</u>, a strong prima facie case coupled with proof of pretext may suffice to create a triable question of fact.").

30

for a jury to view the imposition of an unattainable goal as evidence of pretext because a jury may reasonably view the goal or production quota as an effort to set up an employee for failure." <u>Willnerd v. First Nat. Neb., Inc.</u>, 558 F.3d 770, 779 (8th Cir. 2009) (citing <u>Denesha v. Farmers Ins. Exch.</u>, 161 F.3d 491, 499 (8th Cir. 1998)). Plaintiff has also produced evidence that he disputes the validity of virtually every claim of poor performance that Defendant alleges in this case, from his communication and interpersonal issues at work to his actual engineering-related duties on the job. Therefore, Plaintiff has produced sufficient evidence to create a genuine issue of material fact as to whether Defendant's proffered reasons for his termination are pretextual.

The Court previously determined that there is an issue of material fact in the summary judgment record as to whether Plaintiff was terminated under circumstances from which an inference of unlawful discrimination arises. The Court is further persuaded Plaintiff has produced evidence that, when viewed in the light most favorable to Plaintiff, raises a genuine issue of material fact as to whether Defendant's

proffered reasons for terminating Plaintiff were a pretext for disability discrimination. With the high number of other factual issues surrounding Plaintiff's ADA claims in dispute, and remembering that summary judgment in employment actions should "seldom be granted ... unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party,"[16] the Court is persuaded a jury trial in this case is appropriate. Therefore, Defendant's motion for summary judgment as to Plaintiff's ADA claim will be denied.

## C.  Age Discrimination Under the ADEA

Plaintiff was sixty-six (66) years old when Defendant terminated his employment. At that time, Plaintiff stated that he believed he was oldest person at the company. Plaintiff also alleged that, when he turned 66 years old, he advised Human Resources and the Vice President of Finance that he intended to continue work until age 70 ½ so that he would qualify for medical coverage and whatever other benefits might accrue under Defendant's plan. Defendant, however, argues that it had no information that Plaintiff ever advised as

---

[16] _Hindman_, 145 F.3d at 990.

such.

Under the ADEA, it is unlawful for an employer to "fail to hire or to discharge any individual or otherwise discriminate against any individual ... because of such individual's age." 29 U.S.C. § 623(a)(1). To establish a claim under the ADEA, Plaintiff must prove that age was the but-for reason for Defendant's adverse employment action. Gross v. FBL Fin. Servs., Inc., 129 S. Ct. 2343, 2352 (2009). Because Plaintiff has not provided direct evidence of age discrimination, his claims are analyzed under the McDonnell Douglas standard.[17]

To establish a prima facie case of intentional discrimination under the ADEA, Plaintiff must show that "(1) [he] was a member of the protected group (at least 40 years old); (2) [he] was qualified to perform the job; (3) [he] suffered an adverse employment action; and (4) circumstances

---

[17] The Supreme Court in Gross noted that: "the Court has not definitively decided whether the evidentiary framework of McDonnell Douglas is appropriate in the ADEA context." Gross, 129 S. Ct. at 2349 n.2. This Court will therefore follow controlling Eighth Circuit precedent, which applies the McDonnell Douglas framework to indirect evidence of age discrimination. See Roberts v. USCC Payroll Corp., --- F. Supp. 2d ----, 2009 WL 2139374 (N.D. Iowa July 17, 2009).

permit an inference of discrimination." <u>Bearden v. Int'l</u> <u>Paper Co.</u>, 529 F.3d 828 (8th Cir. 2008).

This Court is persuaded that Plaintiff has not presented sufficient evidence to create a genuine issue of material fact as to his prima facie case under the ADEA. Specifically, Plaintiff presented no evidence of circumstances surrounding his age that would permit an inference of discrimination, aside from his own speculation and allegation. Even assuming Plaintiff could establish his prima facie case (the Court is persuaded he could not), Plaintiff produced no evidence that could satisfy the final step of the <u>McDonnell Douglas</u> test, which requires Plaintiff to prove that Defendant's proffered reason for terminating Plaintiff is a pretext for age discrimination. While Plaintiff has offered evidence that creates a genuine issue of material fact as to whether Defendant's proffered reasons for Plaintiff's termination is pretextual, Plaintiff offered no evidence that could lead a reasonable jury to find that Defendant discriminated against Plaintiff because of his <u>age</u>.[18] Plaintiff presented no

_____

[18] <u>See also</u> <u>Taylor v. White</u>, 321 F.3d 710, 715 (8th Cir. 2003) ("[A]lthough [Plaintiff] does not have to provide direct
(continued...)

evidence that Skibinski or Tolsma knew of his intention to work until he was 70 ½.   There is nothing in the summary judgment record that shows disparate treatment or that company officials or employees displayed an animosity toward, or even referenced, Plaintiff's age.  To the contrary, Defendant hired Plaintiff when Plaintiff was 60 years old.  While this fact alone is not fatal to Plaintiff's claim, there is no evidence that Defendant developed a discriminatory attitude towards Plaintiff's age when Plaintiff was well above the protected age under the ADEA when he was hired.  See Lowe v. J.B. Hunt Transport, Inc., 963 F.2d 173, 175 (8th Cir. 1992). Therefore, Defendant's motion for summary judgment as to Plaintiff's ADEA claim will be granted.

**D.   Retaliation Under 42 U.S.C. § 2000e-3**

Defendant contends that Plaintiff has abandoned his retaliation claim since he did not address the arguments in

---

[18](...continued)
proof that genuine issues of fact exist for trial, the facts and circumstances that [Plaintiff] relies upon must attain the dignity of substantial evidence and not be such as merely to create a suspicion.  In essence, the evidence must be such that a reasonable jury could return a verdict for the nonmoving party.") (internal citations and quotations omitted).

his brief in resistance to Defendant's motion for summary judgment. Plaintiff's counsel conceded that he could not find evidence in the record to support a retaliation claim. The Court agrees.

> A prima facie case of retaliation requires showing that: (1) the employee engaged in protected conduct; (2) reasonable employees would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct.

Brenneman v. Famous Dave's of Am., Inc., 507 F.3d 1139, 1146 (8th Cir. 2007). In this case, Plaintiff cannot establish a causal connection between the protected conduct and the adverse employment action. The protected conduct at issue stemmed from a harassment claim made with Tolsma in 2001. The record shows, however, that Plaintiff's employment did not end until 2003. Thus, there was no temporal connection between the protected activity of 2001 and the adverse employment action of 2003.[19] Defendant's motion for summary judgment as

---

[19] See Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832 (8th Cir. 2002) ("Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation.") (quoting Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999)).

to Plaintiff's retaliation claim under 42 U.S.C. § 2000e-3 will be granted.

## IV. CONCLUSION

Plaintiff has demonstrated a genuine issue of material fact as to whether Defendant discriminated against Plaintiff in violation of the ADA. Plaintiff cannot demonstrate a genuine issue of material fact as to his prima facie claims for age discrimination under the ADEA or retaliation under 42 U.S.C. § 2000e-3.

**IT IS THEREFORE HEREBY ORDERED** that Defendant's motion for summary judgment is **granted in part/denied in part**.

Defendant's motion for summary judgment as to Plaintiff's claim for disability discrimination under the Americans with Disabilities Act (Doc. No. 85 - Count I) is **denied**.

Defendant's motion for summary judgment as to Plaintiff's claims for age discrimination under the Age Discrimination in Employment Act (Doc. No. 85 - Count II) and retaliation under 42 U.S.C. § 2000e-3 (Doc. No. 85 - Count III) is **granted**.

**IT IS SO ORDERED** this 28th day of August, 2009.

Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa